UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NATHANIEL LINDZEN,<br><br>     Plaintiff,<br><br>v.<br><br>STATE STREET CORPORATION, STATE STREET BANK & TRUST CO., and STATE STREET GLOBAL ADVISORS TRUST CO.<br><br>     Defendants. | Civil Action No.: _____<br><br><br><br>**JURY DEMAND** |

**COMPLAINT**

Introduction

1.     Plaintiff Nathaniel Lindzen, a lawyer and derivatives trader with expertise in compliance and trading best practices, was hired in 2015 by Defendants to lead a newly created oversight team. As detailed below, in this role over the next two years he brought to his supervisors' attention and to the attention of other officials in Defendants' employ, numerous reports of non-compliance with a mandated federal remedial program in response to an enforcement action, as well as violations of federal regulatory and statutory securities law. These reports were largely ignored, whether they concerned malfunctioning compliance software, retroactive trade amendments, suspicious communications by traders, or excessive fees. In January 2017, Lindzen filed a whistle-blower report with the Securities and Exchange Commission ("SEC"). In July 2017, Defendants terminated Lindzen three days before an on-site examination by one of Defendants' regulators regarding many of the subjects that he had reported to his superiors. Lindzen now brings claims against Defendants for violations of Section 806 of the Sarbanes-Oxley Act ("SOX") and the Dodd-Frank ("DF") whistleblower protection

provision of the Securities Exchange Act of 1934, 15 U.S.C. § 78u-6(h)(1)(A), seeking all available remedies under the law.

## Parties

2.      Plaintiff Nathaniel Lindzen is a resident of Wayland, Massachusetts and worked, at all times relevant, at State Street Global Advisors' headquarters in Boston, Massachusetts.

3.      Defendant State Street Corporation is a financial holding company incorporated under the laws of the Commonwealth of Massachusetts with its principal place of business in Boston, Massachusetts. State Street shares are publicly listed on the New York Stock Exchange under the symbol STT.

4.      Defendant State Street Bank & Trust Co. is the wholly owned banking subsidiary of State Street Corporation, is incorporated under the laws of the Commonwealth of Massachusetts, and has its principal place of business in Boston, Massachusetts.

5.      Defendant State Street Global Advisors Trust Company is an asset management subsidiary of State Street Bank & Trust Co. and was Plaintiff's employer.

## Facts

### *Lindzen's Compliance Experience*

6.      Lindzen worked as an over-the-counter interest rate derivatives trader for over twelve years at some of the largest banks in the world prior to his employment at State Street. He began at Mitsubishi Bank in NY (now MUFG), then worked for Norddeutsche Landesbank ("Nord/LB") in Germany, and then Mizuho Corporate Bank in NY. Approximately eight of these years were at the Vice President level.

7.      In his prior employment, Lindzen was responsible for structuring, pricing, and trading interest rate swaps, interest rate forwards, interest rate options and credit default swaps for customers of the banks.

8.      As part of this work, Lindzen was also charged with modeling and then hedging the resulting risk from these transactions using exchange traded and over-the-counter derivatives and fixed income securities.

9.      Lindzen received training at these previous jobs in industry best practices with respect to trading, trade processing, and record keeping.

10.      While at Nord/LB, Lindzen passed licensing exams that allowed him to trade directly on one of the world's largest derivative exchanges, Eurex.

11.      While at Nord/LB, Lindzen trained and supervised junior traders.

12.      Lindzen worked on Dodd-Frank compliance matters at Mizuho, and, as a result of this work, became knowledgeable about the requirements of the Dodd-Frank statute.

### Lindzen's Employment at State Street

13.      Around November of 2014, Lindzen began job interviews with Alyssa Albertelli, who was State Street Global Advisors' ("SSGA") then Chief Compliance Officer.

14.      During her interviews of Lindzen, Albertelli informed Lindzen that he was being hired to lead a new oversight team.

15.      On or about March 25, 2015, Albertelli offered Lindzen a job as head of the newly created SSGA Trade Oversight Compliance Team ("TO Team"). Lindzen accepted the offer on or about March 27, 2015 and began his employment at SSGA on April 13, 2015.

16.      Lindzen was hired by Albertelli principally to oversee the completion of a remediation program in response to an enforcement action related to trading. This enforcement

action had been issued in August of 2014 in response to State Street's serious failures to properly oversee its trading and investment businesses.

17.    Albertelli also assigned Lindzen oversight duties in respect to SSGA's need to comply with SEC rules and regulations regarding trading and investment matters, especially pertaining to fraud avoidance and SEC Best Execution requirements.

18.    Lindzen reported to Casey Smith, a deputy of Albertelli.

19.    State Street Corporation has been designated a global systemically important bank ("G-SIB") by the Financial Stability Board, an international entity whose designations are used by the Federal Reserve. In order to protect the public, G-SIB's and their subsidiaries are held by their regulators to heightened standards of financial health, disclosure and supervision.

20.    Lindzen's role included four principal areas: assisting SSGA in vetting and implementing State Street's software remediation solutions; using this software, in concert with SSGA's Market Surveillance Team, as part of SSGA's day-to-day trading and investment surveillance activities; performing regular spot checks of the Market Surveillance Team's effectiveness; and analyzing SSGA's trading and investment activity in order to protect against trading and investment fraud and to ensure compliance with SEC rules, regulations, enforcement directives, and Best Execution requirements.

### *Identifying and Reporting Deficiencies In Compliance and Trading Software*

21.    Shortly after Lindzen was hired, he was informed that SSGA had or was considering purchasing software meant to partially automate certain aspects of the ongoing remediation program. The specific software was not a compliance-oriented tool, but rather was a tool for quantifying the competitiveness of trade execution.

22.     The salespersons for ITG, the software's manufacturers, told SSGA it was appropriate for compliance purposes.

23.     The ITG software that had been purchased by SSGA was riddled with programming and data errors and, as purchased, was fundamentally unsuitable for use as a compliance tool.

24.     Despite these flaws, SSGA's then-Investment Management COO, Rene Guilmet, ("Guilmet") pressured Lindzen to approve the implementation of ITG's Trade Cost Analysis ("TCA") product and downplay its deficiencies.

25.     On information and belief, Guilmet had facilitated or caused the ITG TCA System to be purchased without the competitive bidding process that, on information and belief, State Street normally mandated for such purchases.

26.     On information and belief, a competitive bidding process was also mandated by State Street's response to the enforcement actions.

27.     Lindzen worked with SSGA's IT team for nearly a year in order to have the ITG System reprogrammed and debugged to render it usable in satisfying the necessary response to the enforcement actions and other legal requirements regarding Best Execution and SEC Rule 206 (4)-7 (Compliance). Despite this effort, the ITG System continued to malfunction after it was implemented.

28.     Regulatory guidance issued by the Federal Reserve System's Board of Governors instructs banks to validate all of its models, including those created by third parties. Such validation includes "sound design, theory and logic" as well as "rigorous assessment of data."

29.     Lindzen raised the validation requirement with ITG, Smith, and other senior managers, but ITG never cooperated in providing details as to the design, theory, logic and data quality underlying the ongoing problems with its system.

30.     Disregarding the ITG System's unsuitability and problems, Guilmet and others, including Martin Pearce, then-head of the SSGA Market Surveillance Team ("Pearce"), pressured Lindzen and the IT staff to declare that the system was "operationalized" – meaning problem free, effective, and in use. Lindzen told Smith of this pressure but Smith took no action.

31.     Around September of 2015, despite numerous discussions and emails by Lindzen pointing out the deep flaws in the ITG system, senior SSGA executives attested that the system had been timely and successfully operationalized, and on information and belief, presented the same information to examiners for government regulators that fall.

32.     On or about February 19, 2016, during a meeting on the remediation program with Pearce and Guilmet, Pearce repeatedly asked Lindzen if he had "operationalized" the ITG System. Lindzen replied in the negative and stated that serious and known bugs and data errors made the system unsafe for use. Pearce and Guilmet pressured Lindzen to change his answer, but Lindzen refused. Guilmet told Lindzen that his denial that he had "operationalized" the ITG System "is very unfortunate for you," or words to that effect.

33.     Lindzen reported the above to Smith, but Smith took no action.

34.     In March of 2016, bonuses for the year 2015 were announced. Upon information and belief, they had been determined on or about February 27, 2016.

35.     Lindzen was paid a bonus of approximately 10% of his year to date earnings. On information and belief, Lindzen's bonus was substantially less than his similarly situated and similarly performing peers. On information and belief, Lindzen's refusal to falsely validate the

ITG system contributed to his relatively low bonus (as did his whistleblowing regarding other matters, described *infra*).

36.     In the winter and spring of 2016, State Street's Internal Audit team interviewed Lindzen as part of the remediation program, specifically regarding how the ITG System had been signed off on as operationalized in the fall of 2015 when it was not actually functioning properly.

37.     Around February of 2016, Lindzen made truthful statements to the Internal Audit team regarding ITG's deficiencies. In April of 2016, Lindzen provided the Internal Audit team with additional documents regarding the bugs in the ITG System.

38.     During meetings with Smith in May or June of 2016, Smith severely criticized Lindzen for his truthful statements to the Internal Audit team.

39.     Albertelli also severely criticized Lindzen for the same statements during a meeting with Lindzen in late October of 2016.

40.     In addition to the ITG System, Lindzen was also charged with implementing another software package that was meant to partially automate trading oversight. This system was developed in-house prior to his being hired; it was widely referred to as the "Cognos Reports," or "Cognos System."

41.     The Cognos System was also deeply flawed both in its programming and objectives.

42.     Lindzen worked with the IT department to debug and redesign the Cognos System from the fall of 2015 through the spring of 2016.  As of March of 2016, the process was incomplete and the Cognos System remained flawed, impeding State Street's compliance with the remediation requirements that were part of the government enforcement actions.

43.     On information and belief, SSGA falsely represented to regulators that the Cognos System was effective as proof of SSGA's having met milestones of the remediation program as well as other regulatory requirements.

44.     As with the ITG System, Smith, Guilmet, Jessica Cross, an SSGA project manager ("Cross"), and others pressured Lindzen to attest that the Cognos System was in good working order when he had already informed them that it was not.

45.     During March and April of 2016, Smith, Guilmet, and Cross repeatedly requested that Lindzen attest that the Cognos System had been operationalized.

46.     These requests continued despite Lindzen's repeated reports to Smith, Guilmet, Charles Cullinane, ("Cullinane"), SSGA's Head of Regulatory Affairs, and others regarding serious and ongoing problems with the Cognos System.

47.     On information and belief, attestations that the Cognos System had been successfully operationalized were needed to close out the government enforcement actions.

### *Identifying and Reporting Unsupervised Retroactive Trade Amendments*

48.     During the summer of 2015, Lindzen became aware that SSGA traders were unilaterally and, without third party oversight, retroactively amending key valuation terms in over the counter foreign exchange trades and trades in related derivative contracts.

49.     Based on his specific prior experience, including his work as a trader, Lindzen knew that amendments to valuation terms should include a complete audit trail and independent review by members of the Operations, Risk and Compliance departments. Otherwise, such amendments violate the Investment Company Act and the Investment Advisors Act of 1940.

50.     As an example, Lindzen identified FX purchases and sales that had been executed more than 30 basis points, or hundredths of a percent, above or below the market rate at the time

of the trade. After receiving notification of the flagged trade, the trader then claimed the non-competitive rate was an accidental "error," reached an agreement with the executing broker as to a new more competitive price, and then retroactively modified the FX trade price.

51.     Based on his knowledge and experience, Lindzen reasonably believed the alterations of these valuation parameters violated the requirements of the recent enforcement actions and SEC rules and regulations pertaining to Books and Records, Best Execution, and Compliance.

52.     Lindzen promptly raised the matter of these unsupervised retroactive trade amendments to Smith. Smith referred Lindzen to Guilmet.

53.     Lindzen alerted Smith and then Guilmet that these same traders were also improperly altering the valuation terms of FX forward derivative contracts in order give the impression that the contracts had been executed at the daily London or "WM/Reuters" FX fixing rate.

54.     The London or WM/Reuters FX fixing rate is a published FX benchmark rate based on prevailing interbank FX trade data collected from major brokers and banks over a one minute period each trading day. This one minute period generally begins at 3:59:30 p.m. London time, and ends at 4:00:30 p.m. London time, i.e., the period begins 30 seconds before 4:00 p.m. London time, and ends 30 seconds after. (The WM/Reuters FX fixing is the FX analog to other reference rates such as LIBOR.)  (LIBOR is used as a benchmark for interest rate derivative, money market, and fixed income markets.)

55.     The WM/Reuters fixing is used by asset managers, including SSGA, to, *inter alia*, measure and report to clients how successfully the client trades have tracked prevailing market rates at the time of their execution.

56.     For example, the SSGA traders mentioned above would state and record that the spot FX rate at the time the FX forward contract was executed was the same as the WM/Reuters fixing, when in actuality it was not. They would then adjust the forward premium or discount on the derivative contract to compensate the broker for the gain or loss on the actual spot rate that the derivative was referenced to.

57.     Unlike the FX transactions, the manipulation of the FX forward contracts did not always change their overall values, but did misrepresent to clients the performance of SSGA's hedging activities on their behalf, which Lindzen reasonably believed constituted potential fraud on the asset management clients of State Street.

58.     Over the fall of 2015, Lindzen continued to see unsupervised retroactive trade amendments in both FX transactions and FX forward derivative contracts.

59.     Lindzen researched the matter of unsupervised retroactive trade amendments further with SSGA traders, IT, and Operations personnel to confirm his understanding of the matter.  He also thoroughly read Ernst and Young's SOC-1 audit results as pertained to trade modifications.

60.     He then reached out again to Smith with his concerns. Smith again referred him to Guilmet. Guilmet referred Lindzen to Pearce.

61.     In early to mid-February of 2016, Lindzen contacted Guilmet and informed him that the SOC-1 attestations by SSGA's independent auditor were either incorrect or did not address the matter of the unsupervised retroactive trade amendments, and that the unsupervised retroactive trade amendments posed a problem of potential fraud and needed to be addressed.

62.     This was because the unsupervised retroactive trade amendments could or did have a material impact on the prices obtained for client transactions, investment performance, or hedge performance being reported to these same clients.

63.     Lindzen reasonably believed that these unsupervised trade amendments potentially constituted fraud on SSGA's clients, and also prevented SSGA from fulfilling its Best Execution and record keeping requirements under the Investment Advisers Act of 1940, in that they not only falsified records but also obscured a comparison of market prices with actual execution prices.

64.     In response, Guilmet informed Lindzen that the matter had been escalated to SSGA COO Marc Brown and SSGA Global Head of Operations, Kevin Griffin. Guilmet also demanded to know with whom, in addition to Pearce and Smith, Lindzen had discussed the matter.

65.     Lindzen told Guilmet that the amendments were ongoing and a serious problem and needed to be stopped, and he asked Guilmet whether he intended to stop the practice. In response, Guilmet then told Lindzen that "he was on very dangerous ground" and that "he needed to let sleeping dogs lie on this or else," or words to the effect, and hung up.

66.     Lindzen reported Guilmet's response to Smith in February of 2016. Smith took no action.

67.     On September 7, 2017, the SEC fined State Street 32 million dollars for, *inter alia*, using false trading statements, pre-trade estimates, and post-trade reports to misrepresent its compensation on various transactions, especially purchases and sales of bonds. The SEC described that when some of State Street's clients had noticed that they were being overcharged and questioned State Street about these overcharges, State Street had reversed the charges and

falsely told their clients that the charges were due to "fat finger [trading] errors." These charges were similar to the allegations that Lindzen previously raised internally to State Street with respect to FX transactions.

### *Identifying and Reporting Deficiencies in Market Surveillance Team*

68.     Beginning around the spring and summer of 2016, the Market Surveillance Team, headed by Cullinane, began to take on more of the responsibility for direct first line transaction monitoring, a duty previously assigned to Lindzen.

69.     Lindzen and his two reports were now charged with second line spot reviews of the Market Surveillance Team's work product, their anti-fraud and Best Execution duties, and ad-hoc trading and investment oversight matters.

70.     The Market Surveillance Team repeatedly failed its twice monthly spot checks by Lindzen's team. For instance, Lindzen discovered that traders were seeking to evade surveillance using a variety of tactics such as speaking in foreign languages, using unrecorded office phone lines, using personal email, or using third party chatrooms such as AOL, all of which he reasonably believed violated the government enforcement actions, SEC Rule 206 (4)-7, and the Advisors Act Rule 204-2.

71.     On information and belief, approximately one year prior, State Street had certified that all trading related communications were being monitored and that "chat rooms" where traders or other "Material Risk Takers" could improperly share trading or investment information had been prohibited.

72.     Lindzen documented these failings and reported them weekly to Smith in person, by email and by way of documents placed on a shared electronic Compliance directory.

73.     Lindzen repeatedly voiced his concerns about these findings to Smith including recommending a formal escalation pathway to Albertelli or relevant committees regarding the problems he was identifying.

74.     Smith refused and instead asked Lindzen to bring these concerns to him privately. Later, these failings were identified by the Internal Audit team during one of its audits of the remediation programs. In response to the Internal Audit team's findings, Smith requested that Lindzen use a "Checklist" to document reviews of Market Surveillance Activities.

75.     The Checklist was a formulaic review of Market Surveillance activity that emphasized efficiency over thoroughness in its assessment of the Market Surveillance errors and omissions that Lindzen's team had been identifying. Lindzen objected to use of the Checklist, and so Smith either completed the Checklist himself or assigned the Checklist to Lindzen's subordinate.

76.     Lindzen reasonably believed that the Checklist was a rubber-stamp of the Market Surveillance activity and as such, violated SEC rules and regulations and remediation requirements of the enforcement actions. Lindzen informed Smith of this in September and October 2016, but Smith disregarded these concerns.

### *Identifying and Reporting Compliance Red Flags*

77.     In July of 2016, SSGA completed its purchase of General Electric Asset Management ("GEAM").

78.     Through his work compiling the Quarterly TO Memo, Lindzen identified red flags associated with GEAM's trading and investment activities. Specifically, GEAM was regularly violating explicit terms of the government enforcement actions with respect to trading and investment communications.

79.     Lindzen reasonably believed that GEAM's activities were in clear violation of SEC regulations requiring effective compliance policies and procedures to be in place. GEAM in many instances had none. Based on Lindzen's review, GEAM appeared in addition to have allocated SEC regulated Soft-Dollar trade commission credits, which belonged to its clients, for prohibited internal purposes, such as administrative overhead, risk management, and managerial overhead.

80.     Lindzen reported these red flags to Smith, but Smith failed to take appropriate action.

81.     Based on his training, experience, and knowledge, by October 2016 Lindzen had compiled a list of unchecked and unabated compliance "red flags" that he had previously reported privately to Smith.

82.     Among other issues, these "red flags" involved potential fraud on SSGA's clients, for instance potential trading and investment errors that were not being investigated or reported; violations of SSGA's obligations under a mandatory remediation program; and violations of SEC rules and regulations regarding Best Execution, Record Keeping, Soft Dollar Credits, and Compliance, as well as Section 17(a) of the Securities Act.

83.     Lindzen raised these concerns with Albertelli in October of 2016. Albertelli reacted by scheduling a meeting with Lindzen and a human resources representative responsible for discipline and termination, in which Albertelli emphasized deadlines for remediation efforts to be completed.  To Lindzen's  knowledge, Albertelli took no action on the red flags.

84.     Approximately three weeks after the meeting with Albertelli, Smith finalized Lindzen's 2016 mid-year performance review ("PPR"). The PPR was negative and made numerous false assertions regarding Lindzen's performance, attendance at meetings and

trainings, and the timeliness and substance of his communications to Smith. Lindzen objected to the PPR, and signed under protest.

### *Defendants' Interference with Lindzen's Duties*

85.     In the fall of 2016, SSGA was preparing to inform regulators that they had successfully and timely met their remediation obligations in response to a particular enforcement action. The response required a final review by State Street's Internal Audit team as a precursor to State Street's formal request that the enforcement action be closed.

86.     The regulator's policy and State Street internal policy[1] required that the Compliance department's efforts be independent.

87.     Despite the requirement of independence, Cullinane and Cross, who were in SSGA's Operations department, changed or reversed the Compliance department's work product. Guilmet, who worked for the Investment Management department, did the same.

88.     During the summer and fall of 2016, Smith, Cullinane and Cross denied Lindzen direct access to the SSGA's internal auditor, and pressured Lindzen to certify the efficacy of the remediation efforts Internal Audit was reviewing.

89.     Lindzen told Smith that Cross and Cullinane's interference with his communications with Internal Audit and other departments was compromising the independence required of SSGA Compliance.

90.     Since Lindzen's arrival, the scope of SSGA's Market Surveillance activity and related Compliance oversight had increased approximately ten fold. Yet at the same time, Lindzen's team had been reduced dramatically, and by the end of 2016, he had a single report.

---

[1] State Street Second Line of Defense Compliance Risk Management Policy required that Compliance functions, like Lindzen's, be independent and that such employees have sufficient stature, authority, resources, and access to information.

91.     Market Surveillance Team errors that Lindzen identified over the course of 2016 (and thereafter) and reported to Smith and others, included: failures to perform surveillance over certain traders for months at a time, failure to run surveillance reports on entire asset classes, superficial review of flagged transactions and communications, and covering up off-market transactions that had been flagged.

92.     Lindzen reasonably believed that these errors violated SEC rules and regulations regarding, *inter alia,* Compliance, Record Keeping, and Best Execution.

93.     On information and belief, Smith and Cullinane failed to inform regulators about these and other deficiencies in SSGA's Market Surveillance activities.

94.     In mid-January 2017, Smith completed Lindzen's 2016 year-end PPR. This PPR contained further false negative findings, including those that allegedly occurred during the first half of 2016 that were not mentioned in the mid-year PPR finalized two months prior.

95.     Smith referred to Lindzen's year-end PPR as a "performance improvement plan" ("PIP"). However, the so-called PIP differed substantively and procedurally from a State Street PIP in numerous ways.

96.     A PIP at State Street is normally entered into an employee's personnel file and requires signed receipt by the employee. Lindzen was never contacted by Human Resources regarding any such PIP. Nor was it ever mentioned again or otherwise referenced by State Street until Lindzen filed his OSHA charges after his termination.

### Actions Leading To Termination

97.     Lindzen continued to identify and raise compliance red flags with respect to the Market Surveillance Team activities and other matters within his job duties from January 2017 until his termination.

98.     On or about January 18, 2017, Lindzen completed and sent his first Form TCR whistle-blower tip to the SEC's Office of the Whistleblower.

99.     In this TCR, Lindzen described the compliance deficiencies that he had earlier been reporting to Smith, Albertelli, Guilmet, and others and that are described in this Complaint. Lindzen also described the negative treatment that he was experiencing at State Street.

100.    In January 2017, State Street's Quality Assurance ("QA") Team, part of State Street's Corporate Compliance division, audited Lindzen's Q3 2016 TO Memo, which had identified, among other issues, an interest rate swap transaction that had been executed at a non-competitive rate.

101.    Smith had pressured Lindzen to remove any reports of violations from the Q3 2016 TO Memo and replace them with the bare conclusion of "no issues found."

102.    Lindzen had attempted to track and report items related to red flags that he had identified in the Q3 2016 TO Memo according to SSGA policy in a system called Axentis. but Smith would not permit it.

103.    The Quality Assurance Team was led by Kristen Haggerty.

104.    Haggerty correctly identified the fact that violations had occurred but had not been escalated or recorded in Axentis as required by SSGA policy.

105.    In late January or early February of 2017, Smith told Lindzen that if Haggerty did not drop the matter he would call her boss and shut it down.

106.    In February of 2017, Haggerty informed Lindzen that Smith had reached out to her and that she would not be pursuing the matter further.

107.    Smith told Lindzen when discussing Quality Assurance that he would alter the TO Memos going forward to remove analysis, and include only formulaic description of the testing procedure and the statement "no issues found."

108.    Lindzen told Smith he objected to the removal of analysis.

109.    Lindzen reasonably believed that Smith's removal of the analysis in the TO Memos would amount to a violation of the Books and Records Rule (Rule 204-2) in the Investment Advisers Act of 1940 and related SEC rules and regulations regarding fraud.

110.    Smith subsequently removed the analysis sections of Lindzen's report leaving only the conclusory statement of "no issues found."

111.    In early March of 2017, Smith notified Lindzen that he would receive no bonus for the prior year. Smith told Albertelli that he expected this act would cause Lindzen to quit.

112.    In March and early April of 2017, while working on the Q4 2016 TO Memo, Lindzen discovered that performance or performance benchmarks of certain SSGA funds were being improperly recorded and not reported correctly to clients, which he reasonably believed violated SEC rules and regulations, including SEC Rule 204-2 and possibly section 17(a) of the Securities Act.

113.    Lindzen reported this to Smith, but Smith either took no action or referred Lindzen to Guilmet.

114.    Lindzen also discovered irregularities regarding various SSGA funds and accounts which, though similar or the same in investment holdings to each other, had large performance differentials attributable to varying fees being charged. He found these differentials

by employing so-called "side-by-side" testing, which describes the analysis of funds or client investment accounts that have identical or similar investment strategies and holdings.[2]

115.    Lindzen promptly raised these fee and reporting red flags to Smith and senior managers of SSGA's Performance Measurement and Operations teams.

116.    Smith refused to log these matters or otherwise escalate them. With respect to the potentially excessive fees, Smith referred Lindzen to Guilmet, and directed Lindzen verbally and in writing to attest in his Q4 2016 TO Memo (which would go to State Street employees who interface with clients, mutual fund boards, and SSGA senior compliance and risk committees) that "no issues" had been found. Lindzen refused.

117.    Other reviewers of the Q4 2016 TO Memo, including members of the SSGA Client Reporting team and Risk Management, also requested that Lindzen attest that no red flags had been identified. Lindzen again refused.

118.    On May 2, 2017, Lindzen's team was dissolved and his manager's title removed.

119.    On or about May 3, 2017, Smith again demanded that Lindzen attest in the Q4 2016 TO Memo that no red flags had been found.

120.    On or about May 4, 2017, Lindzen, concerned about the irregularities in the fees that he had identified, reported them to Phillip Gillespie, Executive Vice President and General Counsel, SSGA ("Gillespie").

121.    On or about May 5, 2017 Lindzen emailed Gillespie again to inform him that he believed it was inappropriate to seek resolution of fee-related red flags from Guilmet (as Smith had instructed him earlier) when Guilmet was a senior executive in the division reliant on the fees. Gillespie did not respond.

---

[2] In other words, because these funds or accounts were very similar, their investment returns would be expected to be as well.

122.    Lindzen reasonably believed that Smith's demand that he attest that in the Q4 2016 TO memo that no red flags were found amounted to a violation of the Books and Records Rule in the Investment Advisers Act of 1940 and related SEC rules and regulations pertaining to misrepresentation and fraud.

123.    During the Q4 2016 TO review, Lindzen had also uncovered flaws in SSGA's system that valued interest rate swaps, leading to valuation discrepancies in SSGA's interest rate swap positions.

124.    In early May 2017, Lindzen discovered that despite his own refusal to attest in the Q4 2016 TO memo that "no issues" had been found, Smith had himself provided this inaccurate attestation.

125.    In June 2017, Lindzen discovered an internal SSGA memorandum that described SSGA's preparations for an impending examination by t one of its regulators that was to take place on or about July 17, 2017.

126.    Shortly thereafter Lindzen was added to an email chain by an SSGA Compliance department colleague regarding this examination within SSGA Compliance because of his subject-matter expertise. The subjects of inquiry in the examination substantially overlapped with information that Lindzen had previously provided both internally and to the SEC, and included: whistleblower matters, trading errors, operational errors, Internal Audit issues, compliance issues raised, and identified instances of non-compliance.

127.    On information and belief, SSGA had actual or constructive knowledge regarding the overlap between the examination topics and Lindzen's prior protected disclosures.

128.    On or about June 23, 2017, during Lindzen's spot check of the Market
Surveillance Team, Lindzen identified a telephone conversation that had been overlooked by
Market Surveillance.

129.    In that conversation, an SSGA trader had informed colleagues at his former
employer, a large broker-dealer, that he was preferentially funneling orders to these same former
colleagues, which Lindzen reasonably believed violated SEC Best Execution rules and State
Street policies.

130.    On or about June 27, 2017, Lindzen reported the matter to the manager of the
Market Surveillance Team, Tiffany Hu, and requested that she investigate the matter and then
report back. She did not respond substantively or address the report.

131.    On Wednesday, July 12, 2017, Lindzen was informed in a meeting with by
Human Resources and Smith that his position had been eliminated.

132.    On information and belief, Lindzen was terminated approximately three business
days before the start of the onsite examination by one of State Street's regulators.

133.    On information and belief, SSGA suspected or believed that Lindzen had or was
in the process of reporting SSGA's malfeasance to its regulators.

134.    On or about October 28, 2017, Lindzen timely filed a pro-se SOX complaint with
OSHA.

CAUSES OF ACTION

## COUNT I - SARBANES-OXLEY - 18 U.S.C. § 1514A ("SOX")

135.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1-134 as if fully stated herein.

136.    Plaintiff engaged in protected conducted under SOX in the form of numerous internal reports to his supervisor and others with supervisory authority regarding allegations of improper activities.

137.    Plaintiff reasonably believed the actions of Defendants that he reported internally violated securities fraud, bank fraud, mail fraud, fraud against shareholders, and/or violations of rules and regulations of the SEC.

138.    The Defendants knew that Plaintiff engaged in such protected conduct.

139.    Defendants took adverse action against Plaintiff in the terms and conditions of his employment, including, *inter alia,* criticizing his performance on pretextual grounds, reducing or eliminating his bonus compensation, interfering with his job duties, threatening him, stripping him of the resources necessary for performance of his job, demoting him, and terminating his employment.

140.     Plaintiff's protected activity was a contributing factor to Defendants' decisions to take the aforesaid adverse actions against Plaintiff.

141.    As a consequence of Defendants' adverse actions, Plaintiff has suffered damages, including loss of employment; lost salary and benefits; reputational damages; and humiliation, embarrassment and other emotional distress. He has also incurred attorneys' fees and litigation costs.

## COUNT II – DODD-FRANK -  15 USCS § 78u-6(h) ("DF")

142.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1-141 as if fully stated herein.

143.    Plaintiff engaged in protected conducted under DF in the form of filing a TCR whistleblower report with the SEC in January 2017, prior to termination of his employment by Defendants.

144.    Plaintiff reasonably believed the actions of Defendants that he reported internally and to the SEC violated securities fraud, bank fraud, mail fraud, fraud against shareholders and violations of rules or regulations of the SEC.

145.    The Defendants knew that Plaintiff engaged in such protected activity, namely internal reports to Defendants about the improper practices described above.

146.    Defendants took adverse action against Plaintiff in the terms and conditions of his employment, including, *inter alia,* criticizing his performance on pretextual grounds, reducing or eliminating his bonus compensation, interfering with his job duties, threatening him, stripping him of the resources necessary for performance of his job, demoting him, and terminating his employment.

147.    Defendants took the adverse actions against Plaintiff set out above because of his protected activity..

148.    As a consequence of Defendants' adverse actions, Plaintiff has suffered loss of employment; has lost salary and benefits; and has incurred attorneys' fees and the costs of litigation.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays this Court to:

1.   Grant Plaintiff judgment under Counts I and II;;

2.   Under both Counts, ORDER the Defendants to pay the Plaintiff damages for
     lost wages and benefits;

3.   ORDER the Defendants to reinstate the Plaintiff without any loss of
     compensation, benefits, or seniority;

4.   Under Count I, ORDER the Defendants to pay Plaintiff his damages for
     emotional distress, reputational harm, and other non-economic injuries;

5.   Under Count II, award Plaintiff liquidated damages in the amount of his lost
     salary and benefits;

6.   Under both Counts, ORDER the Defendants to pay Plaintiff's attorneys'
     fees and costs as allowed by law; and

7.   Order Defendants to pay Plaintiff prejudgment and postjudgment interest on
     his damages; and

8.   Grant such further relief as is just and necessary.

   **<u>Plaintiff demands trial by jury on all counts so triable.</u>**


                              Respectfully submitted,
                              NATHANIEL LINDZEN

                              By his attorneys,


                              _____/s/ Joseph Sulman_____
                              Joseph L. Sulman, BBO #663635
                              Andrea Haas, BBO #671844
                              Law Office of Joseph L. Sulman
                              391 Totten Pond Road, Suite 402
                              Waltham, MA 02451
                              (617) 521-8600
                              jsulman@sulmanlaw.com
                              ahaas@sulmanlaw.com

Dahlia Rudavsky, BBO #433300
Messing, Rudavsky & Weliky, P.C.
One Gateway Center
300 Washington Street, Suite 308
Newton, MA 02458
(617) 742-0004
drudavsky@mrwemploymnetlaw.com

Dated: July 9, 2020